UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARCUS D. MAYS #218101,                        Case No. 2:17-cv-00167

        Plaintiff,                        Hon.   Paul L. Maloney
                                         U.S. District Judge

    v.

UNKNOWN PYNNONEN et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This is a civil rights action brought by state prisoner Marcus D. Mays pursuant to 42 U.S.C. § 1983.   Mays alleges that on May 25, 2017, several Corrections Officers assigned to the Baraga Correctional Facility (AMF) assaulted him in the hallway when he was returning to his cell after receiving x-rays of his right hand.   Mays alleges that he sustained significant injuries as a result of the assault. He also says that several nurses refused to provide him with medical care. Mays asserts violations of his rights under the First Amendment, Eighth Amendment, and Fourteenth Amendment.

Defendants in the case are Corrections Officers (COs) Pynnonen, Coronado, Perala, Massie, Geneman and Anderson; Registered Nurses (RNs) Corrigan, Snyder, Rajala, Usitalo, Sunburg and Fingan; and Physician Assistant (PA) Nyquist.[1]

The remaining Defendants filed motions for summary judgment.  (ECF No. 89 (motion for summary judgment by PA Nyquist based on the merits of Mays's retaliation claim and his failure to exhaust his administrative remedies) and ECF No. 92 (motion for summary judgment filed by the MDOC employees based on the merits of Mays's claims).)  Mays filed responses.  (ECF Nos. 101 and 105.)  PA Nyquist filed a reply.   (ECF No. 107.)

It is respectfully recommended that the Court grant Defendants' motions for summary judgment and dismiss this case.

## II.   Procedural History

On February 26, 2019, this Court dismissed Mays's claims against Defendants Grubb and Wealton, his retaliation claims against all Defendants except Defendant Corrigan, and his food poisoning claims due to Mays's failure to exhaust his administrative remedies.   (See ECF No. 67 (granting motion for summary judgment filed by MDOC Defendants (ECF No. 29) based on Mays's failure to exhaust).)   On September 17, 2019, the Court dismissed Mays's access-to-the-courts claim and his Eighth Amendment claims against PA Nyquist because he was not suffering from a serious medical need when he requested medical care on June 5, 2017, and because

---

[1]    These spellings are drawn from the case docket in the Court's electronic court filing (ECF) system.  The Court recognizes that some of these names are spelled differently within the record.

2

he did not suffer the injuries he alleged in the complaint.    (*See* ECF No. 76 (granting in part PA Nyquist's motion for summary judgment (ECF No. 43) based on the merits of Mays's claims.)    With respect to Mays's Eighth Amendment claim against PA Nyquist, the Court explained as follows:

> The medical records do not support Plaintiff's assertion that he was injured. The injuries arose allegedly from a severe beating by some of the guards on May 25 and from the guards poisoning Plaintiff's food. The medical records establish Plaintiff was largely uncooperative with the medical staff and the medical staff did not find any physiological manifestations of the alleged injuries. The medical records show Plaintiff refused to be seen by health care on May 26. (ECF No. 45 PageID.460-62.) Plaintiff was seen by a nurse on May 27 and given medication for swelling and pain. (*Id.* PageID.463.) Plaintiff was observed at his cell by the staff on May 28, and the staff did not see any visible swelling. (*Id.* PageID.464.) A nurse visit occurred on May 29 which ended early because Plaintiff refused to cooperate. (*Id.* PageID.467-68.) Plaintiff was seen by a nurse on June 2, who conducted an oral examination. (*Id.* PageID.474-75.) Plaintiff complained of pain but the nurse did not document any swelling or numbness. (*Id.*) In this case, where the medical staff could not corroborate Plaintiff's assertions, his subjective complaints of pain will not satisfy the objective prong of the deliberate-indifference standard.

(ECF No. 76, PageID.842, 844.)

Finally, the Court found that Mays's allegation that, on June 5, 2017, PA Nyquist refused to treat him because he had filed a grievance, created a genuine issue of fact on his claim of retaliation.[2]  (*Id.*, PageID.843.)

---

[2]    The Court rejected the R&R recommending dismissal of the retaliation claim because "the question is not whether a jury would accept Plaintiff's version of events. For this motion, the question is whether any evidence support Plaintiff's version of events."   (ECF No. 76, PageID.843.)    The Court found that Defendant Nyquist's

The remaining claims are summarized in the table below:

| Number | Claim | Defendant | Date or Date Range of Incident(s) |
|--------|-------|-----------|-----------------------------------|
| 1 | Eighth Amendment excessive force | COs Pynnonen, Coronado, Perala, Massie, Geneman, and Anderson | May 25, 2017 |
| 2 | Eighth Amendment deliberate indifference: refusal to treat Mays's injuries | RNs Corrigan, Snyder, Rajala, Usitalo, Sunburg, and Fingan | Late May and early June 2017 |
| 3 | Retaliation | PA Nyquist | June 5, 2017 |
| 4 | Retaliation | RN Corrigan | May 25, 2017 |
| 5 | Denial of access to the courts | COs Pynnonen, Coronado, Perala, Massie, Geneman, Anderson, RNs Corrigan, Snyder, Rajala, Usitalo, Sunburg, and Fingan | May-June 2017 |

### III.   Factual Allegations

Mays says that COs Anderson and Wealton escorted him to his cell on May 25, 2017.   He says that they were met inside the 3-block segregation unit entrance by COs Coronado, Perala, Massie, Geneman, and Pynnonen.   (ECF No. 1, PageID.6.) Mays alleges that these Defendants assaulted him with force while he was restrained because he had filed past lawsuits.   (*Id*.)   Mays says that Pynnonen and Coronado

---

version of the events in the exam room on June 5 and Plaintiff's version of the events were different.   (*Id*.)   Although, that finding could foreclose a motion for summary judgment on the merits of the issue, Defendant Nyquist has also moved for dismissal due to Mays's failure to exhaust administrative grievance remedies.

4

told him that if he filed a grievance about the assault, they would give him a misconduct ticket and remove him from the Incentive Program, which is a program designed to release segregation prisoners to general population.  (*Id*.)

Mays says that he sustained injuries that included a swollen jaw, and head and body pain.  (*Id*.)  Mays says that he told RN Corrigan, who was doing rounds, about the assault and his injuries.  (*Id*.)  She allegedly responded: "I don't care if they kill you Mays, you filed a lawsuit on me!"  (*Id*.)

Mays says that later that day, Defendants Anderson and Pynnonen passed out food trays with poisoned food.   When Mays complained that his throat was burning and he was throwing up blood, Defendants Anderson and Pynnonen responded that they did not care.  (*Id*., PageID.7.)

Mays says that when RN Corrigan was doing rounds later in the day, he told her that he was in extreme pain from the beating he had received, that his food tray had been tampered with, that his throat was burning and that he was spitting up blood.  (*Id*., at PageID.8.)   RN Corrigan allegedly ignored him and just continued to do her rounds.  (*Id*.)

Mays says RN Snyder told about the pain he was experiencing, his swollen jaw, and the poisoned food, and she simply stated: "[y]ou look fine to me," and kept doing her rounds.  (*Id*.)  When nurse Rajala was doing rounds, she refused treatment after Mays told her about the assault and the pain that he was in, explained that his food had been poisoned, and showed her his swollen jaw.  (*Id*.)

On May 26, 2017, Mays showed his swollen jaw to RN Usitalo, and told her his head was still hurting, his throat was burning, and he was spitting up blood from food poisoning, but he received no treatment.  (*Id*.)  On May 27, 2017, Mays told RN Sunburg that his head was hurting and he showed her his swollen jaw, explaining that his throat was burning and that he was spitting up blood because of food poisoning.  (*Id*.)  Mays says he was refused medical treatment.  Later he told RN Fingan about his need for health care treatment, and Fingan responded that "[a] little ass whipping ain't going to hurt you Mays . . . and I hope that you choke on that blood you['re] spitting up and die."  (*Id*.)

Mays says that on May 27, 2017, after he showed Fingan a speck of blood and told him his head was hurting real bad, Fingan stated: "That's too bad, you were supposed to be called out by RN Nicole Sunburg."  (*Id*.)  Later when Mays told Fingan about his injuries, he responded: "You filed a grievance on me and the PA on 12-23-16.  Damn your fucking injuries."  (*Id*.)

On June 2, 2017, Mays was called-out by RN Snyder and Nurse Supervisor Arron Jeffierys because of his requests for medical care.  Defendant Snyder told him that he had no injuries.  (*Id*., PageID.9.)  Mays told Defendant Sunburg on June 4, 2017, that his jaw and head were hurting and that he was still spitting specks of blood.  (*Id*.)  Sunburg refused treatment, laughed, and walked away with Defendant Pynnonen.  (*Id*.)  The next day, Mays was escorted to health care by Defendants Anderson, Coronado and Pynnonen.  Mays says that Pynnonen stated: "We always got a way to cover up when we whip a prisoner's ass.  The PA is not

6

going to help you any more than the nurse did.    You still spitting up blood?    We tried to break your fucking jaw and knock your fucking head off your shoulder you little spotted bitch."    (*Id*.)

Mays says that PA Nyquist refused to treat him because he had named her in a grievance and because he did not have any injuries.    (*Id*.)    Mays says that his jaw was still swollen and his head still hurts.    (*Id*.)

Mays filed grievance AMF-17-06-1437-12e4, regarding the assault and lack of medical care.    According to the documents Mays filed with his complaint, the date of the incident was May 25, 2017, and he filed his grievance on May 31, 2017.    (ECF No. 1-4, PageID.36.)

After an investigation was conducted, his claims were determined to be false. The Step I grievance response states in part:

The grievant's allegations of assault by staff were reported to custody administrative staff and upon investigation, it was determined his allegations were unfounded.

The grievant was scheduled to be seen by the nurse on 5-26-17 after he alleged he was assaulted. However he refused to allow the nurse to evaluate him. The grievant submitted a health care request which was processed on 5-26-17 alleging injury from assault and he was scheduled to be evaluated by the nurse again. On the 27th the grievant refused to be evaluated by the nurse. Another health care request was submitted by the grievant and processed on 5-27-17. An appointment was scheduled on the 29th. During rounds the nurse spoke with grievant cell-side on the 28th at which time the nurse determined the grievant was in no apparent distress, provided patient education and informed the grievant that he was scheduled to be evaluated by the nurse the following day. On 5-29-17 when the nurse attempted to evaluate the grievant he became disruptive and hostile and it was necessary to end the visit. On 5-29-17 a health care request from the grievant was processed regarding the alleged assault. The grievant was scheduled to see the nurse on the 31st although due to the grievant's threatening behavior toward housing staff and the nurse the appointment was cancelled. On 6-1-17 a fourth health care request was received and processed. An appointment was scheduled on 6-2-17. The grievant was evaluated by the nurse and referred to the medical provider. The medical provider evaluated the grievant on 6-5-17. At no time did the grievant have any visible bruising, swelling, abrasions or evidence of injury. The medical provider recommended the grievant continue his current prescribed medication, increase fluid intake, provided education and reassurance.

(ECF No. 1-4, PageID.38.)

## IV. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury[3] or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## V.  Exhaustion of Administrative Remedies

PA Nyquist argues that Mays failed to exhaust his administrative remedies against her.  A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove.  *Jones v. Bock*, 549 U.S. 199, 212-16 (2007).  "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir.

---

[3]    Disputed issues of fact regarding exhaustion under the PLRA may be decided in a bench trial and need not be submitted to a jury.  *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).

2001).    Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.    *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).    A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.    *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.    *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).    "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"    *Jones*, 549 U.S. at 218-19.    In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process

through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. ___, 136 S.Ct. 1850, 1859-60 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524.  In the Court's view, this objective was achieved in three ways.  First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Id.* at 525.  Second, "the internal review might 'filter out some frivolous claims.'"  *Id.* (quoting *Booth*, 532 U.S. at 737*).*  And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id.* When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration.  *Baker v. Vanderark*, 1:07-cv-004, 2007 WL 3244075, *5 (W.D. Mich., Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective on July 9, 2007, superseded on March 18, 2019), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.  *Id.* at ¶ P.   If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.   *Id.* at ¶¶ P, V.   The inmate submits

11

the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ V.    The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely.    Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).    Dates, times, places and names of all those involved in the issue being grieved are to be included."    *Id.* at ¶ R (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.    MDOC Policy Directive 03.02.130 at ¶¶ T, BB.    The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances.    *Id.* at ¶ DD.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ T, FF.    The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.    *Id.* at ¶¶ T, FF.    The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.    *Id.* at ¶ GG.

"The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved."    *Id.* at ¶ S.

In addition, the grievance policy provides that, where the grievance alleges conduct that falls under the jurisdiction of the Internal Affairs Division pursuant to Policy Directive 01.01.140, the prisoner may file his Step I grievance directly with the inspector of the institution in which the prisoner is housed, instead of with the grievance coordinator, as set forth in ¶ W of Policy Directive 03.02.130.   *Id.* at ¶ R. In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I.   *Id.*   Regardless of whether the grievance is filed with the grievance coordinator or the inspector, the grievance will be referred to the Internal Affairs Division for review and will be investigated in accordance with MDOC Policy Directive 01.01.140.   The prisoner will be promptly notified that an extension of time is needed to investigate the grievance.   *Id.*

Where the grievance procedures are not available because the issue presented is non-grievable, exhaustion of prison grievance procedures is not required.   It is well-established that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues." *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *Mays v. Kentucky Dept. of Corrections*, 2018 WL 4603153, at *3 (W.D. Ky. Sept. 25, 2018) ("It is beyond debate that an inmate cannot be required to exhaust administrative remedies regarding non-grievable issues."); *Reeves v. Hobbs*, 2013 WL 5462147 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance

procedure. As the well known proverb states, they cannot have their cake and eat it too.").

When prison officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).    The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits.  *See id*. at 325. We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court."  *Id*. at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[4]

---

[4]      In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."   *Id*. at 596. For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

The parties have identified one relevant grievance: **Grievance AMF-17-06-1437-12e4.**   Mays says that this grievance exhausted his claim that PA Nyquist retaliated against him on June 5, 2017, during his physical examination, by not providing him with treatment and care.   Mays filed his Step I grievance on May 31, 2017, and asserted an incident date of May 25, 2017.   This grievance pre-dates the examination that occurred on June 5, 2017.   Part of the Step I grievance is attached below:



(ECF No. 105-3, PageID.1177-1178.)

Mays's complaint alleges that PA Nyquist retaliated against him on June 5, 2017.   (ECF No. 1, PageID.9.)   The filing of a grievance can obviously constitute protected conduct.   *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).   Thus, the grievance shown above, which was filed on May 31, 2017, could constitute the protected conduct that led to the alleged retaliation on June 5.   But this Step I grievance could not serve as the vehicle through which Mays exhausted his subsequent retaliation claim against

15

Nyquist.    In order to exhaust his retaliation claim against Nyquist, Mays would have to file a separate grievance that alleged retaliation by PA Nyquist on June 5, or he would have to raise the retaliation issue in his Step II and III appeals of **Grievance AMF-17-06-1437-12e4 _and_** the MDOC would have to address those specific claims. The record includes no additional grievance that addresses alleged retaliation by Nyquist on June 5.[5]

In response, May asserts that the MDOC did address his complaints against Nyquist at Steps II and III of this grievance (ECF No. 101, PageID.1112) and, accordingly, that he exhausted his claims against Nyquist.

A review of the grievance documents indicates that MDOC did not address Mays's retaliation claim against Nyquist in its responses to Mays's Step II and III appeals of **Grievance AMF-17-06-1437-12e4.**    First, Step I of this grievance raises numerous complaints against many different people.    This Step I grievance runs two pages in length, with single-spaced lines.    (ECF No. 1-4, PageID.36-37.)    As noted, the Step I grievance was filed before June 5.    Thus, it could not allege a retaliation claim against PA Nyquist on June 5.

The Step I response, which is shown below, was issued on June 15.    (ECF No. 1-4, PageID.38.)    The response found that Mays's account lacked credibility.    The

---

[5]    Similarly, **grievance AMF-17-01-46-12D3** (ECF No. 105-4, PageID.1205-1206), which states an incident date of December 21, 2016, did not exhaust the June 5, 2017, retaliation claim.    Furthermore, Mays admits in his complaint that **grievance AMF-17-08-1982-28E**, which lists an incident date of May 25, 2017, was rejected and procedurally denied.    (ECF No. 1, PageID.3.)

response also notes that Mays saw a medical provider – presumably PA Nyquist – on

June 5.

> The Grievant alleges he was assaulted by staff, reported it to multiple nurses and was not evaluated for his injuries.
>
> The grievant's allegations of assault by staff were reported to custody administrative staff and upon investigation, it was determined his allegations were unfounded.
>
> The grievant was scheduled to be seen by the nurse on 5-26-17 after he alleged he was assaulted. However he refused to allow the nurse to evaluate him.  The grievant submitted a health care request which was processed on 5-26-17 alleging injury from assault and he was scheduled to be evaluated by the nurse again.  On the 27[th] the grievant refused to be evaluated by the nurse.  Another health care request was submitted by the grievant and processed on 5-27-17.  An appointment was scheduled on the 29[th].  During rounds the nurse spoke with grievant cell-side on the 28[th] at which time the nurse determined the grievant was in no apparent distress, provided patient education and informed the grievant that he was scheduled to be evaluated by the nurse the following day.  On 5-29-17 when the nurse attempted to evaluate the grievant he became disruptive and hostile and it was necessary to end the visit.  On 5-29-17 a health care request from the grievant was processed regarding the alleged assault.  The grievant was scheduled to see the nurse on the 31[st] although due to the grievant's threatening behavior toward housing staff and the nurse the appointment was cancelled.  On 6-1-17 a fourth health care request was received and processed. An appointment was scheduled on 6-2-17.  The grievant was evaluated by the nurse and referred to the medical provider.  ==The medical provider evaluated the grievant on 6-5-17.  At no time did the grievant have any visible bruising, swelling, abrasions or evidence of injury.  The medical provider recommended the grievant continue his current prescribed medication, increase fluid intake, provided education and reassurance.==
>
> Should the grievant have further medical complaints he is encouraged to contact health care.

(*Id.*)

Mays filed a Step II appeal of this response on June 25, 2017.   (*Id.*,

PageID.39.)   Mays's Step II appeal is also hand-written, single-spaced and runs two

pages in length.   (*Id.*, PageID.39-40.)   His Step II appeal does attribute retaliatory

conduct to Nyquist.   (*Id.*, PageID.40.)

The Step II response, which is shown below, affirmed the Step I denial.   The

Step II response did not address Mays's claims of retaliation by Nyquist.

**Grievance Step II Response**                                 **MAYS 218101**

Grievant claims that Health Care denied him evaluation and treatment after he was assaulted by custody staff on 5/25/17.

==Investigation determined that grievant's issue was appropriately addressed by the Step I Respondent and is affirmed at the Step II Appeal.== Per that response, grievant's allegation of staff assault was investigated and found to be without merit.  Review of the electronic medical record confirms that Health Care repeatedly offered grievant the opportunity for evaluation in response to his requests for same.  Grievant repeatedly declined and/or behaved in a manner that made termination of the encounters necessary.  ==Grievant was subsequently evaluated by the medical provider on 6/5/17; no acute findings were noted.==

Grievance denied.

Grievant is encouraged to promptly notify Health Care should any adverse symptoms persist or worsen in future.

(*Id.*, PageID.41.)

Mays then filed a Step III appeal, which is shown below.



(*Id.* PageID.39.)   Although this appeal is virtually incomprehensible, the MDOC

ruled on this appeal on the merits, affirming the Step I and II responses.   (ECF No.

105-3, PageID.1180.)   The Step III response is shown below.

**Step III Grievance Response** 5.140

Marcus Mays                              218101

AMF     17061437

Grievant alleges he was inappropriately denied an assessment by health care post assault with staff on May 25, 2017.

All relevant information within the electronic medical record has been reviewed. Step I and Step II appropriately addressed this grievance and are affirmed at the Step III appeal.

Grievance appeal denied.

(*Id.*)

In the opinion of the undersigned, the record before the Court shows that Mays did not exhaust his retaliation claim against PA Nyquist for several reasons. First, Mays did not raise his retaliation claim against Nyquist at Step I. As noted above, he filed his Step I grievance *before* the alleged retaliation took place.

Mays only raised this retaliation claim against Nyquist at Step II. (*See* ECF No. 1-4, PageID.39-40.) Mays correctly notes that a prison does exhaust when the MDOC ignores procedural problems and addresses the issue. But here, the MDOC did not address the retaliation claims he raised at Step II. Mays's retaliation claim against Nyquist at Step II is embedded in a host of complaints about the events that took place from May 25, 2017, through early June 2017. In the opinion of the undesigned, the fact that Mays mentioned his claim against Nyquist at Step II in this manner does not constitute exhaustion of his claim against Nyquist.

The exhaustion requirement "afford[s] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at *Porter*, 534 U.S. at 525. Furthermore, in order to properly

19

exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-91.    The MDOC grievance process is simple.    Indeed, the MDOC form that Mays used at Step I directed him to state his issue clearly and use a separate grievance form for each issue.    (*See* ECF No. 1-4, PageID.36 (the MDOC Form CSJ-247A filed by Mays at Step I).)    Mays did not comply with these requirements.    Instead, he wrote pages of semi-legible script at each step of the process and stated multiple complaints against multiple people on multiple days.    The MDOC would essentially need a scorecard to track and address his evolving claims.    A review of the Step II and III response indicates that the MDOC limited itself to an assessment of the core of the claim Mays raised at Step I (prior to the alleged retaliation by Nyquist) and did not address the claims he brought up at Step II.    For example, there is no indication in the record that the MDOC spoke to either Mays or Nyquist after the filed his Step II appeal about Mays's retaliation claim.    The MDOC focused on the core of the claims he raised at Step I.    Thus, the MDOC did not address Mays's retaliation claim against Nyquist.

The MDOC is not required to untangle a Gordian knot of exhaustion claims created by a prisoner.    Mays did not comply with the MDOC's grievance procedures. His grievance documents are nearly incomprehensible.    The MDOC was justified in focusing on the core of Mays's initial claims.    Mays's insertion of additional claims later in the process does not serve to exhaust those claims.

In the opinion of the undersigned, Mays did not exhaust his retaliation claim against PA Nyquist in **grievance AMF-17-06-1437-12e4**.    It is respectfully recommended that the Court dismiss this claim without prejudice.

## VI.    Eighth Amendment Excessive Force Claims Against COs

The Eighth Amendment limits the power of the states to punish those convicted of a crime.    Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency."    *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain."    *Id.* at 346. Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification."    *Id.*

To establish an Eighth Amendment claim, Plaintiff must satisfy both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).    "The subjective component focuses on the state of mind of the prison officials." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011).    "The objective component requires the pain inflicted to be 'sufficiently serious.'"    *Williams*, 631 F.3d at 383 (quoting *Wilson*, 501 U.S. at 298).

Under the subjective component, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."    *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992).    The Court "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer."    *Kingsley v. Hendrickson*, 135 S. Ct. 2466,

2474 (2015).   In determining whether the use of force is malicious or sadistic, the Court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response.  *Hudson*, 503 U.S. at 6-7.

Under the objective component, the pain inflicted must be 'sufficiently serious.'" *Williams*, 631 F.3d at 383 (quoting *Wilson*, 501 U.S. at 298).   The Court's inquiry regarding the seriousness of the injury is "contextual" and is "responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8–9.   While the extent of an inmate's injury may help determine the amount of force used by the prison or jail official, it is not dispositive of whether an Eighth Amendment violation has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).   When prison or jail officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated, "[w]hether or not significant injury is evident."   *Hudson*, 503 U.S. at 9.

Mays alleges that he was assaulted by COs Pynnonen, Coronado, Perala, Massie, Geneman, and Anderson while he was being escorted back to his cell.   Mays states that he was being escorted while wearing handcuffs, and that the Defendants attacked him and repeatedly punched and kicked him all over his body.   (ECF No. 93-1, PageID.1050.)   Mays asserts that he sustained injuries that included a swollen eye, swollen jaw, busted lip, and purple and blue bruises all over his body.   (*Id.*, PageID.1051.)

As previously stated, Mays's medical records do not support his claim that he sustained injuries such as swelling in his eye and jaw, a busted lip, and bruising. (ECF No. 67, PageID.842, 844.)   In addition, an MDOC investigation determined that Mays was not assaulted or denied medical care.   (ECF No. 1-4, PageID.38.) Mays has failed to produce any evidence that supports his claim that he was attacked by the six Defendants and repeatedly punched and kicked to the point that he sustained serious injuries.   There exists no medical evidence to support his claim of injuries, no witnesses to the alleged assault, and no witnesses to support his claim of sustaining any injury at all.   The absence of medical evidence showing injury is particularly telling. The undersigned will discuss the medical evidence in greater detail below as part of an analysis of Mays's deliberate indifference claim against the RNs.   In general terms, Mays's medical records for late May and early June 2017, which are included in ECF No. 45, present a comprehensive and detailed view of the treatment Mays received after the alleged assault.   Contrary to Mays's assertions, his medical records indicate an absence of evidence of swelling or bruising.   Medical staff attempted to respond to Mays's medical kites, but frequently had to deal with hostility or lack of cooperation.   Mays yelled at staff and refused to attend scheduled appointments.   Sometimes he was even threatening to medical staff.

Further, Mays simply fails to support his claims of severe injury with admissible facts.   Mays's claims that he was severely beaten and suffered significant injuries is entirely inconsistent with the record.   Inconsistency is not, by itself, enough to dismiss a case.   But the inconsistencies here are so significant that they

necessitate the granting of Defendants' motion for summary judgment.

In analyzing Defendants' motion for summary judgment and Mays's response, the undersigned is required to consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co.*, 421 F.3d at 436. The Second Circuit explained a district court's responsibilities in assessing inconsistent testimony in *Jeffreys v. The City of New York*:

> Our inquiry focuses on whether the District Court erred in concluding, upon review of the record as a whole, that there were no genuine issues of material fact in the instant case-that is, that even after drawing all inferences in the light most favorable to Jeffreys, no reasonable jury could have issued a verdict in his favor. While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," . . . and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

426 F.3d 549, 554 (2nd Cir.2005) (internal citations omitted).  Mays relies entirely on his own statements in asserting that he was assaulted and sustained severe injuries.  As explained, there exists no supporting evidence for Mays's claims.  All the record evidence – investigation reports, grievance findings, and medical evidence – establishes that no assault or injury occurred.  There exists no evidence in the

24

record that could support Mays's claim of significant injury or that he was the victim of an assault and severe attack by Defendants.    Stated differently, Mays's account does not create a genuine issue of material fact because it is entirely inconsistent with the records before the Court.

As this Court explained in the order dated September 17, 2019, Mays has simply failed to support his Eighth Amendment claims.

In the opinion of the undersigned, Mays's Eighth Amendment excessive force claims should be dismissed.

## VII.    Eighth Amendment Deliberate Indifference Claims Against RNs

Mays asserts that RNs Corrigan, Snyder, Rajala, Usitalo, Sunburg, and Fingan were deliberately indifferent to his serious medical needs.    The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* "[A]n inmate who complains that ***delay in***

25

*medical treatment* rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted). The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's *failure to treat a condition adequately*, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added). Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition: A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second

guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).   "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."   *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

The medical records from May and June 2017 (ECF No. 45) present a comprehensive and detailed view of the treatment Mays received after the alleged assault.   In general, and contrary to Mays's assertions, he was examined and received pain medicine for his claims of pain and inflammation despite the absence of evidence of swelling or bruising.   Mays was largely uncooperative with medical staff.   He yelled at staff and refused to attend scheduled appointments.   Sometimes he was even threatening to medical staff.   The records here lead the undersigned to conclude that the Defendant RNs are entitled to summary judgment on Mays's Eighth Amendment deliberate indifference claims.

Mays initially requested health care by sending a kite (a written request for medical care) on May 26, 2017.   But after arriving in the examination room, he refused an examination and treatment.   (ECF No. 45, PageID.460.)   His exam was rescheduled for May 27, 2017.   (*Id.*, PageID.461.)   Nurse Sunburg was doing medical rounds on May 27, 2017, when Mays began yelling at her that his kites were being destroyed and he was never "called out"[6] after being assaulted.   (*Id.*, PageID.462.)

On May 27, 2017, Mays sent another kite saying his jaw was swollen. Defendant Fingan responded to the kite by instructing Mays to take Naproxen as ordered for pain and swelling and to "Please come out for all scheduled Health Care callouts."   (*Id.*, PageID.463.)   Another appointment was scheduled for May 31, 2017.   (*Id.*)

On May 28, 2017, Defendant Fingan visited Mays at his cell and noted that despite claims of a sore jaw and mild headache there was "no visible inflammation of the jaw."   (*Id.*, PageID.464-465.)   Mays was provided with Ibuprofen and Naproxen. (*Id.*)   On May 29, 2017, Mays's health care visit ended after he refused to answer questions about his health and yelled at custody staff.   (*Id.*, PageID.467-468.)

On May 31, 2017, while RN Sunburg was delivering medications, Mays yelled at her and harassed her and hit his cell door.   (*Id.*, PageID.471.)   Custody staff did not take him out of his cell due to his threatening behavior.   (*Id.*)

---

[6]    The term "call-out" refers to prisoner movements within the prison that are authorized by staff.

Mays sent a kite complaining that he was not called out of his cell for health care on May 31, 2017, and that he still had not been treated for his swollen jaw and head pain.  (*Id*., PageID.45.)   On June 1, 2017, Nurse Duquette scheduled Mays for sick call on or about June 5, 2017.   (*Id*.)   Mays was examined on June 2, 2017, by RN Usitalo.   (*Id*., PageID.45.)   Mays complained that he had been assaulted and beaten by several officers.   (*Id*.)   RN Usitalo noted that Mays had already been given Naproxen for pain.   (*Id*.)   RN Usitalo notified custody staff that an alleged assault had taken place.   (*Id*., PageID.475.)   As a result, Sergeant Linder reviewed the cameras and found no evidence of an incident of assault.   (*Id*., PageID.475-476.)

Mays was given a comprehensive physical exam by PA Nyquist on June 5, 2017, after he complained of muscle and gastrointestinal issues.   (*Id*., PageID.477-479.)   At that time Mays informed PA Nyquist that he had been beaten by Corrections Officers but the swelling in his jaw had gone down.   (*Id*.)   Mays denied vision problems, ear pain, hearing loss, dizziness, memory loss, facial numbness, dysphagia, swelling, bruising, and abrasions.   (*Id*.)   PA Nyquist also discussed with Mays his complaints that he was poisoned and was spitting up blood.   (*Id*.)

Mays was examined by RN Corrigan on June 7, 2017, after he complained that PA Nyquist had not provided treatment and that he was still suffering from pain and was experiencing migraines from being assaulted.   (*Id*., PageID.481.)   Nurse Corrigan noted that the examination was "unremarkable" and that "inmate is still adamant about assault taking place."   (*Id*.)   RN Corrigan referred Mays to mental health care for an evaluation because his behavior seemed abnormal.   (*Id*.,

PageID.483.)   Mays was examined by mental health.   He said that the officers who assaulted him would pay through a lawsuit.   (*Id*.)   Mays was coherent, with a goal-oriented thought process, and in no distress.   (*Id*.)

Mays continued to receive regular health care throughout 2017.   (*Id*., PageID.484-561.)   Mays insisted that his jaw was broken, but an x-ray revealed no fractures and showed that everything was normal. (*Id*., PageID.498-499.)

Despite Mays's complaints that he was denied medical care and treatment, the medical records establish that he received significant treatment for his alleged injuries, including repeated examinations and pain medication.   On many occasions, Mays failed to cooperate with medical staff who were attempting to treat him.   In addition, he received an x-ray of his jaw after he complained that it was broken.   In the opinion of the undersigned, there exists no evidence that Mays was denied treatment for a serious medical need or that any Defendant was deliberately indifferent to any of Mays's medical needs.

## VIII.   Retaliation by PA Nyquist and RN Corrigan

Mays alleges that Defendant Corrigan retaliated against him by denying him medical treatment on May 25, 2017, and that PA Nyquist[7] retaliated against him by denying him medical treatment on June 5, 2017.   Mays says that these retaliatory acts were triggered by his past lawsuits or grievances.

---

[7]   Defendant Nyquist had previously moved for summary judgment on the merits of this retaliation claim.   (ECF No. 43, PageID.400.)   The Court denied the motion finding that a genuine issue of fact existed.   (ECF No. 76, PageID.843-844.)    It is recommended that the Court decline to address Defendant Nyquist's second attempt for summary judgment on the merits of this claim.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).   In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant." *Id.* at 399 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

Mays claims that Defendant Corrigan retaliated against him on May 25, 2017, after he showed her his injuries, by stating: "I don't care if they kill you Mays, you filed a lawsuit on me!"   (ECF No. 1, PageID.6.)   The records in this case do not support Mays's claim that he was denied medical treatment by Corrigan on May 25. First, there exists no evidence that Mays sustained injuries such as bruising and a swollen jaw, or that he suffered from head pain.   Second, Mays had access to pain medication because he was being treated for pain.   And third, Mays was scheduled for an examination at health care the next day for his alleged injuries, but after arriving at the examination room, he refused treatment.   Some of the records are shown below.

- 33 -

PATIENT:               MARCUS MAYS
DATE OF BIRTH:     █████████
DATE:                05/26/2017 11:00 AM
INMATE ID:          218101

---

### Clinical Progress Note

**Comments:**
Prisoner on schedule for kite related appointment.  Walks to health care exam room and then refuses to be seen.
To kite for health care needs PRN.

**Date:** 05/26/2017
**Time:** 11:00 AM
**User:** Vicki E. Usitalo, RN

(ECF No. 45, PageID.460.)

PATIENT:               MARCUS MAYS
DATE OF BIRTH:     █████████
DATE:                05/27/2017 9:49 AM
INMATE ID:          218101

---

### Clinical Progress Note

**Comments:**
Spoke with inmate on med rounds. Inmate began yelling at this nurse that "his kites were being destroyed and he
was never called out to be evaluated for an assault that happened on 5/25/17". Upon review of his chart, he was
called out, presented to the exam room and then refused.  Inmate very agitated and argumentative at this time.

**Date:** 05/27/2017
**Time:** 9:50 AM
**User:** Nicole A. Sundberg, RN

(*Id.*, PageID.462.)

PATIENT:                     MARCUS MAYS
DATE OF BIRTH:        ███████
DATE:                         05/28/2017 6:57 PM
INMATE ID:                 218101

---

### Clinical Progress Note

**Comments:**
Talked with inmate cellside regarding kite received on 5/27/17.  RN explained, through much yelling and argumentative attitude that he had been called out and refused 5/25/17, and yelled at RN cellside, therefore not seen on 5/26/17.

On 5/27/17, nothing was stated by inmate during PM medpass by RN.  Kite received 5/27/17 - informed that he had been scheduled for a callout on 5/29/17.

Cellside assessment , A&Ox3, conversing clearly with yelling and argumentation, No SOB, Resp non-labored, no distress.  Inmate stated that he had a sore jaw and mild headaches. Cellside assesment shows no visible inflammation of jaw. RN educated on use of prescribed medication Naproxen for h/a and inflammatory relief.

Inmate scheduled for callout on 5/29/17 RN encouraged inmate to come out for all HC callouts.

On 5/2

**Date:** 05/28/2017
**Time:** 6:57 PM
**User:** David A. Finegan, RN

(*Id.* PageI.464.)

In the opinion of the undersigned, Mays has failed to show that he suffered an adverse action at the hands of the health care workers he alleges retaliated against him.  Mays was already being treated with pain medication and, when he was scheduled for an examination the next day, he refused treatment.  Under these circumstances, it is recommended that the Court dismiss Plaintiff's retaliation claim against Defendant Corrigan.

### IX.  Mays's Access to the Courts

Mays asserts an access-to-courts claim against Defendants Pynnonen, Coronado, Perala, Massie, Geneman, Anderson, Corrigan, Snyder, Rajala, Usitalo, Sunburg, and Fingan. (ECF No. 1, paragraphs 32, 41, 43.)  Mays never fully explained this claim and his allegations are vague and conclusory.  It is well-

established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The right of access to the courts prohibits prison officials from erecting barriers that may impede the inmate's accessibility to the courts. *Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992). In order to state a viable claim for interference with his access to the courts, a plaintiff must show actual prejudice or "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005).   In the opinion of the undersigned, Mays has failed to establish his access to the courts claim by showing actual prejudice or actual injury to any pending or contemplated litigation.

### X.   Eleventh Amendment – official capacity

Defendants move to dismiss Plaintiff's official capacity claims as barred by the Eleventh Amendment.   The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."   *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

> A suit against a state official in his or her official capacity for damages cannot be maintained pursuant to § 1983 because that official has Eleventh Amendment immunity. This is true because "a suit against a state official in her or her official capacity is not a suit against the official but rather is a suit against the official's office." As such, a suit against a state official in his or her official capacity is no different than a suit against the state.

*Clark v. Chillicothe Corr. Inst.*, No. 2:19-CV-954, 2020 WL 1227224, at *3 (S.D. Ohio

Mar. 13, 2020) (citations omitted).

The Sixth Circuit, in interpreting *Will*, has held "that plaintiffs seeking damages under § 1983 [must] set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials. *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989). To the extent that Plaintiff seeks money damages, costs, and fees from Defendants in their official capacity, that part of his lawsuit is barred by sovereign immunity.[8]

## IX. Recommendation

It is respectfully recommended that the Court grant Defendants motions for summary judgment (ECF Nos. 89 and 92) and dismiss PA Nyquist without prejudice due to Mays's failure to exhaust his administrative remedies and dismiss the remaining Defendants with prejudice. Acceptance of this recommendation will dismiss the case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections

---

[8] "There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies; and (c) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Only the second exception is potentially at issue here. "Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Id.* Although, Plaintiff sought a transfer from Baraga Correctional Facility, he is now housed at Marquette Branch Prison making his request for injunctive relief moot.

constitutes a waiver of any further right to appeal.    *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).    *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:    January 5, 2021                                    /s/ *Maarten Vermaat*
                                                            MAARTEN VERMAAT
                                                            U.S. MAGISTRATE JUDGE